**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- X

THE VILLAGE OF ENDICOTT,

               *Plaintiff*,

    - against -

INTERNATIONAL     BUSINESS     MACHINES
CORPORATION ("IBM")

         *Defendant*.

----------------------------------------------------------------X

               **COMPLAINT**

Violations of 42 U.S. Code § 9607: the Comprehensive Environmental Response, Compensation, and Liability Act §§ 107(a), 9607(a)(4)(B), 9613(g)(2); Public Nuisance, Failure to Warn, Negligence, Trespass, Punitive Damages

**JURY TRIAL DEMANDED AND ENDORSED HEREON**

       **PLAINTIFF**, The Village of Endicott (hereinafter referred to as the "Village" or "Plaintiff"), by and through its attorneys Napoli Shkolnik, PLLC, as and for its Complaint against the above-named Defendant, upon information and belief respectfully alleges as follows:

## NATURE OF THE ACTION

       1.     The Village of Endicott brings this action against Defendant for contamination of its water supply wells by hazardous substances, including but not limited to 1,4-Dioxane, a toxic chemical, PFAS and other toxic chemicals.

       2.     Upon information and belief, Defendant's facilities have been linked to the contamination of soil, surface water and groundwater with 1,4 Dioxane, perfluorooctanoic acid ("PFOA"), ammonium perfluorooctanoate ("APFO"), perfluorooctanesulfonic acid ("PFOS"), perfluorohexane sulfonic acid (PFHxS); perfluorononanoic acid (PFNA); perfluoroheptanoic acid (PFHpA), perfluorodecanoic acid (PFDA), per-and polyfluoroalkyl substances (PFAS), and other manufactured compounds and hazardous chemicals.

3.      As used herein, the term "1,4-Dioxane", includes dioxane, dioxan, p-dioxane, diethylene dioxide, diethylene oxide, diethylene ether and glycol ethylene ether.

4.      1,4-Dioxane, PFAS and other toxic chemicals were purchased, transported, used, processed, mixed, stored, handled, spilled, disposed and/or released by Defendant at the industrial facilities and/or properties they own(ed) and/or operate(d), where these hazardous chemicals entered the soil and groundwater and, subsequently, migrated downgradient and contaminated Plaintiff's drinking water supply.

5.      Defendant knew or reasonably should have known that these harmful compounds would inevitably reach groundwater, significantly pollute drinking water wells, render drinking water unusable and unsafe, and threaten the public health and welfare, as it has done and continues to do with respect to Plaintiff's wells.

6.      Plaintiff maintains and operates public drinking water supply wells for the benefit of its residents, including wells 5, 28 and 32 ("wells"), along the Susquehanna River.

7.      Plaintiff's wells draw from the upper and lower aquifer beneath Broome County to provide drinking water to over 13,000 residential customers.

8.      As a direct and proximate result of Defendant's acts and omissions which are the sole and direct cause of Plaintiff's injuries, The Village's water production wells have become contaminated with 1,4-Dioxane, PFAS, and other chemicals from the release and/or releases of Defendant's toxic and hazardous substance, thereby rendering the water unusable and unsafe for human consumption and daily use.

9.      Because of Defendant's careless and negligent acts and omissions, 1,4- Dioxane, PFAS, and other chemicals have contaminated the aquifer from which Plaintiff draws potable water and supplies water for its customers.

10.    Plaintiff's damages, caused by the above contamination, include, but are not limited to, investigation costs, testing and monitoring costs, costs of planning, design and installation of water treatment systems, treatment, operating and maintenance costs, infrastructure modifications, land acquisition to install new public water supply well(s), engineering fees, purchasing of potable water from neighboring towns and other related costs.

11.    Defendant, as the responsible parties — and not Plaintiff or its residents — should bear all past, present and future costs of addressing the above contamination.

12.    Upon information and belief, each Defendant is responsible, negligently, intentionally and/or in some other actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages thereby to Plaintiff, as alleged, either through each Defendant's own conduct or through the conduct of its agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing injury, or in some other actionable manner.

## BACKGROUND OF 1,4-DIOXANE

13.    1,4-Dioxane, a synthetic industrial chemical, is a highly toxic substance.  It has been found to migrate considerably farther in groundwater than other solvents, due to the compound's complete miscibility and the absence of conditions that promote its biodegradation. When in water, 1,4-Dioxane does not respond to air stripping or granular activated carbon treatment.

14.    It has been used in many products, including paint strippers, dyes, greases, varnishes, solvents and waxes. 1,4-Dioxane is also found as an impurity in antifreeze and aircraft deicing fluids and in some consumer products, including deodorants, shampoos and cosmetics.

1,4-Dioxane was mainly used as a stabilizer for chlorinated solvents such as 1,1,1-Tricloroethane (TCA); a solvent for impregnating cellulose acetate membrane filters; a wetting and dispersing agent in textile processes; and a laboratory cryoscopic solvent for molecular mass determinations and in Trichloroethylene (TCE), a degreaser for metal parts.

15.     1,4-Dioxane is classified by the EPA as "likely to be carcinogenic to humans" by all routes of exposure.  Short-term exposure may cause eye, nose and throat irritation, and damage caused by long-term exposure includes kidney and liver damage. 1,4- Dioxane is listed as No. 214 on the 2017 CERCLA Priority List of Hazardous Substances issued by the Agency for Toxic Substances and Disease Registry.

16.     1,4-Dioxane is short-lived in the atmosphere, but leaches readily from soil to groundwater, migrates rapidly in groundwater and is relatively resistant to biodegradation in the subsurface.

17.     Maximum Contaminant Levels ("MCLs") are enforceable drinking water standards determined by weighing the costs of treating contaminated water against the adverse health effects of the chemical.

18.     The EPA regulates 1,4-Dioxane under the Clean Air Act (CAA), Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), Resource Conservation and Recovery Act (RCRA), and Superfund Amendments and Reauthorization Act (SARA). Neither the EPA nor the federal government have established an MCL for 1,4-Dioxane for drinking water, but have issued guidelines and health standards for it, establishing 0.35 ppb for cancer and 0.46 ppb for tap water. The New York State Department of Health (DOH) default standard is 50 ppb.

19.     In early 2016, New York State urged the EPA to acknowledge that 1,4- Dioxane contamination is a national problem that requires federal standards.

20.     On April 26, 2017, in response to growing public concern about drinking water pollution, Governor Andrew Cuomo signed the Clean Water Infrastructure Act, a $2.5 billion investment in drinking water infrastructure and water quality protection across the state. The legislation requires all New York-based water systems to test for 1,4-Dioxane contamination.

21.     In September 2017, Governor Cuomo appointed 12 members to a new Drinking Water Quality Council tasked with ensuring that all New Yorkers have access to safe and clean drinking water. The Council's initial responsibility includes recommending an enforceable MCL for 1,4-Dioxane as a priority emerging contaminant that remains unregulated by the federal government. The members of the Council held meetings and received letters and recommendations from interest groups to comply with this mission.

22.     On December 18, 2018, the New York State Department of Environmental Conservation announced that Governor Cuomo's Drinking Water Quality Council recommended the MCL for 1,4-Dioxane to be set at 1.0 part per billion (ppb). The State of New York also approved an effective new treatment technology for 1,4-Dioxane called Advanced Oxidative Process (AOP), which is already being utilized by many public water purveyors throughout the New York State.

23.     On July 8, 2019, Governor Cuomo announced that Dr. Howard Zucker, Commissioner of the Department of Health (DOH), had accepted the recommended 1,4-Dioxane MCL of 1.0 ppb. Following Dr. Zucker's decision, Governor Cuomo directed the DOH to begin the regulatory process for adopting this enforceable standard, which includes publishing a Notice of Proposed Rulemaking in the New York State Register and a 60-day public comment period.

24.     On July 30, 2020, the DOH acted on the above recommendation and voted to enact the proposed MCL in the drinking water regulations in 10 NYCRR Part 5.

25.    As of August 26, 2020, New York State's MCL for 1,4-dioxane in public drinking water is 1 part per billion (ppb). This was the first MCL for 1,4-dioxane in the country.

26.    1,4-Dioxane contamination has been detected at Wells 5, 28 and 32 in levels that exceed the MCL by three times the limit, forcing Plaintiff to incur damages to install treatment on its supply wells.

## BACKGROUND OF PFAS

27.    PFAS are chemical compounds containing fluorine and carbon. These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

28.    PFOA is one of the two most widely studied types of these PFAS substances.

29.    PFOA has unique properties that causes it to be: (a) mobile and persistent, meaning that it readily spreads into the environment where it breaks down very slowly; (b) bioaccumulative and biomagnifying, meaning that it tends to accumulate in organisms and up the food chain; and (c) toxic, meaning that it poses serious health risks to humans and animals.

30.    PFOA easily dissolves in water, and thus it is mobile and easily spreads in the environment. PFOA also readily contaminates soils and leaches from the soil into groundwater, where it can travel significant distances.

31.    PFOA is characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA is thermally, chemically, and biologically stable. It resists degradation due to light, water, and biological processes.

32.    Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is eliminated through the processes of metabolism and excretion.

Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

33.    PFOA bioaccumulates/biomagnifies in numerous ways. First, it is relatively stable once ingested, so that it bioaccumulates in individual organisms for significant periods of time. Because of this stability, any newly ingested PFOA will be added to any PFOA already present. In humans, PFOA remains in the body for years.

34.    PFOA biomagnifies up the food chain. This occurs, for example, when humans eat fish that have ingested PFOA.

35.    The chemical structure of PFOA makes it resistant to breakdown or environmental degradation. As a result, it is persistent when released into the environment.

36.    Exposure to PFAS is toxic and poses serious health risks to humans and animals.

37.    PFAS are readily absorbed after consumption or inhalation and accumulate primarily in the bloodstream, kidney, and liver.

38.    Once the truth about PFOA was revealed, researchers began to study the environmental and health effects associated with them, including a "C8 Science Panel".[1]

39.    The C8 Science Panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the Panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy-induced hypertension (including preeclampsia), and hypercholesterolemia.

40.    In laboratory testing on animals, PFOA has caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

---

[1] *See generally* http://www.c8sciencepanel.org.

41.     The injuries caused by PFAS can arise months or years after exposure.

42.     Even after the C8 Science Panel publicly announced that human exposure to 50 parts per trillion, or more, of PFOA in drinking water for one year or longer had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendant repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFOA in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

43.     On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015, including PFOA.[2]

44.     In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and the development of safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[3]

45.     On May 25, 2016, the EPA released a lifetime health advisory level ("HAL") for drinking water and health effects support documents for PFOA and another type of long-chain

---

[2] *Revisions to the Unregulated Contaminant Monitoring Regulation (UCMR 3) for Public Water Systems*, 77 Fed. Reg: 26072 (May 2, 2012) (*available at* https://www.govinfo.gov/app/details/FR-2012-05-02/2012-9978).

[3] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. "The Madrid statement on poly- and perfluoroalkyl substances (PFASs)," 123 Environ Health Perspectives  123:A107–A111; (2015) (available at, http://dx.doi.org/10.1289/ehp.1509934).

PFAS, perfluorooctane sulfonate ("PFOS").[4] The EPA developed the HAL to assist government officials in protecting public health when PFOS and PFOA are present in drinking water. The EPA HAL identified the concentration of PFOS and PFOA in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure at 0.07 ppb or 70 ppt. The HAL was based on peer-reviewed studies of the effects of PFOS and PFOA on laboratory animals (rats and mice) and was also informed by epidemiological studies of human populations exposed to PFOS. These studies indicated that exposure to PFOS and PFOA over the HAL could result in adverse health effects, including:

a. Developmental effects on fetuses during pregnancy, or on infants during breastfeeding (e.g., low birth weight, accelerated puberty, skeletal variations);

b. Cancer (testicular and kidney);

c. Liver effects (tissue damage);

d. Immune effects (e.g., antibody production and immunity);

e. Thyroid disease and other effects (e.g., cholesterol changes).

46.    In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of PFCs. The NTP concluded that both PFOA and PFOS are "presumed to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects

---

[4] *See* Fed. Register, Vol. 81, No. 101, May 25, 2016, Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate (*available at* https://www.federalregister.gov/documents/2016/05/25/2016-12361/lifetime-health-advisories-and-health-effects-support-documents-for-perfluorooctanoic-acid-and).

in human (epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.[5]

47.    IARC similarly concluded that there is "evidence" of "the carcinogenicity of . . . PFOA" in humans and in experimental animals, meaning that "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is . . . credible."[6]

48.    Under California's Proposition 65, California has listed PFOA and PFOS as a chemical known to cause reproductive toxicity under the Safe Drinking Water and Toxic Enforcement Act of 1986.[7]

49.    In June, 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and EPA released a draft toxicological profile for PFOS and PFOA and recommended that the drinking water advisory levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.[8]

50.    On February 20, 2020, the EPA announced a proposal to regulate PFOA and PFOS under the Safe Drinking Water Act, which the agency characterized as a "key milestone" in its

---

[5] *See* U.S. Dep't of Health and Human Services, Nat'l Toxicology Program, *NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate* (Sept. 2016), at 1, 17, 19, (*available at* https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf).

[6] *See* Int'l Agency for Research on Cancer, IARC Monographs, *Some Chemicals Used as Solvents and in Polymer Manufacture* (Dec. 2016), at 27, 97, (*available at* http://monographs.iarc.fr/ENG/Monographs/vol110/mono110.pdf).

[7] California Office of Environmental Health Hazard Assessment, *Chemicals Listed Effective Nov. 10, 2017 as Known to the State of California to Cause Reproductive Toxicity: Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)*, Nov. 9, 2017 (*available at* https://oehha.ca.gov/proposition-65/crnr/chemicals-listed-effective-november-10-2017-known-state-california-cause).

[8] ATSDR, *Toxicological Profile for Perfluoroalkyls: Draft for Public Comment* (June 2018) (*available at* https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf).

efforts to "help communities address per- and polyfluoroalkyl substances (PFAS) nationwide."[9]
Following a public comment period on its proposed decision, the EPA will decide whether to move
forward with the process of establishing a national primary drinking water regulation for PFOA
and PFOS.

51.     On June 15, 2022, the EPA released new drinking water health advisory levels
(HALs) for four PFAS, including new interim HALs for PFOS and PFOA that departed
significantly from the 2016 EPA HAL they replaced.[10] Specifically, EPA issued HALs of 0.004
ppt for PFOA and 0.02 ppt for PFOS,[11] which collectively accounted for only a small fraction of
the combined 70 ppt HAL that preceded them.  Importantly, EPA set these interim HALs at levels
below which PFOS and PFOA can be measured using current analytic methods, meaning that the
mere detection of PFOS or PFOA in a water provider's system would be sufficient on its own to
exceed the new levels.   Furthermore, the EPA has set a PFAS goal of ZERO for PFOA and PFOS.

52.     As support for its decision, EPA explained that the science had evolved since 2016
and that the new interim HALs for PFOS and PFOA were "based on human studies" that "found
associations between PFOA and/or PFOS exposure and effects on the immune system, the
cardiovascular system, human development (e.g., decreased birth weight), and cancer."[12]
Specifically, EPA had performed updated health effects analyses for PFOS and PFOA to provide

---

[9] Press Release, *EPA Announces Proposed Decision to Regulate PFOA and PFOS in Drinking Water*, Feb. 20, 2020 (*available at* https://www.epa.gov/newsreleases/epa-announces-proposed-decision-regulate-pfoa-and-pfos-drinking-water).

[10] *See* Fed. Register, Vol. 87, No. 36848, June 21, 2022, Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances.
[11] *Id.*

[12] EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Communities* at 1-2 (June 2022) (*available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-communities.pdf).

support for the drinking water regulations the agency planned to adopt for the two chemicals under the SDWA. Based on these analyses, EPA concluded that "the levels at which negative health effects could occur are much lower than previously understood when EPA issued the 2016 health advisories for PFOA and PFOS —including near zero for certain health effects."[13] For this reason, the agency determined there was a "pressing need to provide updated information on the current best available science to public health officials prior to finalization of the health effects assessment."[14]

53.    Because the referenced health analyses are still undergoing final review by the EPA's Science Advisory Board, the agency has stated that the new interim HALs for PFOS and PFOA are subject to change. However, it has indicated that it does not anticipate any changes resulting in revised HALs for PFOS and PFOA that are greater than the 4 ppt minimum reporting level[15] that applies to Public Water Systems.[16]

---

[13] EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Public Water Systems* at 2 (June 2022) (*available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-water-system.pdf).

[14] EPA Office of Water, EPA Doc. No. 822-R-22-003, *INTERIM Drinking Water Health Advisory: Perfluorooctanoic Acid (PFOA) CASRN 335-67-1* at 18 (June 2022) (*available at* https://www.epa.gov/system/files/documents/2022-06/interim-pfoa-2022.pdf; EPA Office of Water, EPA Doc. No. 822-R-22-004, *INTERIM Drinking Water Health Advisory: CASRN 1763-23-1* at 18 (June 2022) (*available at* https://www.epa.gov/system/files/documents/2022-06/interim-pfos-2022.pdf).

[15] As EPA's website explains, the Minimum Reporting Level ("MRL") for Unregulated Contaminant Monitoring Rule (UCMR) 5 is the minimum quantitation level that, with 95 percent confidence, can be achieved by capable analysts at 75 percent or more of the laboratories using a specified analytical method. The MRLs in EPA's chart are based on the UCMR 5 requirement to use EPA Method 533.

[16] EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Public Water Systems* at 2 (June 2022) (*available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-water-system.pdf).

54.    On September 6, 2022, the EPA published a notice of proposed rulemaking seeking public comment on its plan to designate PFOS and PFOA as hazardous substances under CERCLA.[17] Pursuant to that notice, the deadline for all comments from the public was November 7, 2022.

55.    On October 5, 2022, the Governor of New York signed legislation (S.8763A/A.9824A) allowing public water suppliers to revive any action, civil claim, or cause of action involving an emerging contaminant in drinking water that may have been barred because the statute of limitations had expired.

56.    The legislation defines an emerging contaminant as any physical, chemical, microbiological, or radiological substance that is identified or listed as an emerging contaminant in a public health or any other law, which would include the PFAS chemicals at issue in this action.

57.    The legislation local water authorities until April 5, 2024, to pursue actions against polluters to recover the costs of treatment and filtration as a result of contamination that might otherwise be barred under the statute of limitations.

## CONTAMINATION OF PLAINTIFF'S WELLS WITH 1,4-DIOXANE

58.    Endicott, New York is best known as the "Birthplace of IBM" as it was the original location of all IBM manufacturing, research, and development from the early 1920's through World War II.

59.    For much of its history in the Village of Endicott, IBM used industrial solvents to clean metal parts in degreasers at its Endicott Campus. Subsequently, IBM dumped tons of

---

[17] *See* Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 87 Fed. Reg. 54415 (Sep. 6, 2022) (*available at* https://www.federalregister.gov/documents/2022/09/06/2022-18657/designation-of-perfluorooctanoic-acid-pfoa-and-perfluorooctanesulfonic-acid-pfos-as-cercla-hazardous).

industrial solvents, used to clean computer parts, down drains. These solvents also leached from leaky pipes into the ground for years before environmental rules required that such "spills" be reported.

60.    The known contamination began in 1979 when IBM used liquid cleaning agents in circuit board assembly operations for more than two decades, and six spills and leaks were recorded, including one leak in 1979 of 4,100 gallons from an underground tank. The initial 1979 Spill details included 4,100 gallons of the printed circuit board solvents of TCA (methyl chloroform or 1,1,1-trichloroethane).

61.    As a result of these spills and discharges, in 1980 a general survey of the local hydrogeological conditions was performed by Dames & Moore, a civil engineering company specializing in a variety of civil engineering, environmental and earth science disciplines, providing consulting services to corporate and government clients. Chemicals were detected in the ground water beneath the IBM Site in water samples obtained from the six (6) observation wells installed during the investigation. The investigation included the installation of 52 additional observation wells, which assisted in defining the nature and extent of the solvent in the ground water as related to the solvent release.

62.    The main constituents of the solvent were identified as Methyl Chloroform (MCF), Trichloroethylene (TCE), Perchloroethylene (PCE) and Benzene. Also present in smaller concentrations were Methylene Chloride, Freon, Toluene and Xylene. In total approximately 78,000 gallons of chemicals were released by IBM into the air, leading them to have been identified by the Department of Environmental Conservation as the major source of pollution in the Endicott area.

63.    As a result of the spills, a solvent pool formulated along with a TCA Plume, with the chemicals then being pushed down towards the wells given the flow direction of the

groundwater. This solvent pool was located in areas where the silt layer is relatively thin, causing the TCA to migrate into the lower aquifer.

64.     In 2002, scientists discovered a large underground chemical plume, which was releasing toxic gases into homes and offices in a 350-acre swath south of the campus. This has become known as "toxic vapor intrusion," and the main chemical causing the vapor was the liquid cleaning agent trichlorethylene (TCE), which has been linked to cancer and other illnesses.

65.     In 2004, IBM entered into a formal consent order to investigate and remediate the contamination. An investigation was prepared for IBM on December 3, 2003, by Groundwater Sciences, P.C., and was revised and updated on May 17, 2004.

66.     The report from this investigation confirmed that in December 1979, IBM determined that a release of 4,200 gallons of 1,1,1-tricholorethane (TCA) had occurred at the IBM campus in Endicott, corroborating the Dames & Moore report in 1980. IBM was responsible for the excavation and removal of contaminated soil down to the water table and disposed of it in a secure landfill.

67.     Four years later, after purchasing a property known as the "Clark Street Campus" from Endicott Johnson, IBM determined from sampling performed prior to IBM commencing any activities (including building upon or occupying the property) that there was contamination of soil by chromium and several volatile organic compounds ("VOCs") such as tetrachloroethane (PCE), trichloroethene (TCE), 1,1,1-trichloroethane (TCA), methylene chloride, dichloromethane (DCEM) and toluene). As a consequence of this contamination, IBM performed a soil removal action before occupying the property that resulted in the offsite disposal of nearly 780 tons of contaminated soil.

68.     As of August 2018, it was reported in the New York State Department of Environmental Conservation Record of Decision for OU1 that TCA was detected within the IBM

plume at concentrations of as high as 75,000 ug/l (or parts per million) and DCA (a TCA degradation product) was detected as high as 27,000 ug/l within the IBM plume.

69.    During water testing in 2021, Endicott Municipal Water Works Test Results exceeded the recently enacted water standards of 1 ug/l for 1,4-dioxane in  both Well # 5 (3.8 ug/l; 3 ug/L; and 3 ug/l) and Well # 28 (3.3 ug/l; 2.7 ug/l; and 2.4 ug/l).

70.    From 2000 to 2004, 1,4-dioxane was detected in water samples collected from  Well 5 ranging from 1.9 - 3.8 ug/l. During this same time period, the detections of 1,4-Dioxane at Well 28 have ranged from 1.6 to 3.3 ug/l.

71.    Evidence shows that the IBM releases have impacted the lower aquifer from which the Village draws water. The TCA discharges from IBM have several pathways to migrate to the lower aquifer where Endicott Public Supply Wells sources its water.  It is clear and undisputed that 1,4-Dioxane, a stabilizer used for TCA, has been found in Wells 5 and 28 as well as in the IBM monitoring wells.

72.    1,4-Dioxane has also been detected in Well 32, at concentrations levels ranging from 0.5 ug/L – 0.8 ug/L, as well as significant detection at the Endicott landfill (65 ug/L). IBM had admitted to disposing of 12-15 truckloads daily of industrial sludges and other materials at this landfill.

73.    It is recommended by the Department of Health and is customary for water providers in New York, to implement water treatment when chemicals such as 1,4-Dioxane and/or PFAS reach half of the MCL levels.

## CONTAMINATION OF PLAINTIFF'S WELLS WITH PFAS

74.    PFAS have been detected at the IBM site, which is hydraulically upgradient to the Village's wells.  From 2020-20204, it was reported by Endicott Village Water Department that PFAS compounds were detected at concentrations as high as: 1) PFOS = 200 ng/L; 2) PFOA = 58

ng/L; 3) PFNA = 170 ng/L; and 4) PFHxS = 17 ng/L.  Detections of PFAS chemicals have been detected in Well 5 as high as 6.9 ng/L and 10.3 ng/L at well 28.

75.     PFAS have also been detected in the Endicott Landfill monitoring wells at concentrations up to: 1) PFOA – 46 ng/L; and 2) PFOS = 150 ng/L.

76.     In order to ensure that it can continue to provide clean and safe water to residences and businesses, Plaintiff has and will continue to take action to address the above contamination of its property and its potable water supply, caused by Defendant.

77.     Such action includes, but is not limited to, additional testing and monitoring for 1,4-Dioxane and PFAS, planning, designing, purchasing, installing and maintaining water filtration systems to remove these chemicals, infrastructure modifications, contingency planning, public notice and outreach.

78.     As part of these efforts, Plaintiff has and will continue to incur high costs associated with additional sampling and monitoring, capital and operational costs of water treatment, and all other measures that may be necessary to address and mitigate the contamination for many years to come.

## JURISDICTION

79.     This Court has jurisdiction over Defendant IBM as this action arises from the violation of Federal Laws, including but not limited to The Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") codified in 42 U.S.C. Chapter 103 and the "National Contingency Plan" codified in 40 C.F.R. Part 300.

80.     This Court has personal jurisdiction over Defendant IBM as it is doing business in New York and/or owns property in New York such that it is reasonably foreseeable that they would be subject to the jurisdiction of the courts of this State.

81.     This Court has long-arm jurisdiction over Defendant IBM because the cause of action arises out of transaction of business within New York causing injury in New York.

82.     This Court has long-arm jurisdiction over the Defendant IBM because the cause of action arises from the commission of tortious acts within New York causing injury in New York.

83.     This Court has long-arm jurisdiction over Defendant IBM because the cause of action arises out of the ownership, use or possession of real property situated in New York State.

## VENUE

84.     This case is properly venued in this Court pursuant to 28 U.S.C §1391(b)(1) due to Defendant IBM being subject to this Court's personal jurisdiction with respect to such action given its principal place of business located in Armonk, New York (Westchester County).

## THE PARTIES

### Plaintiff

85.     **The Village of Endicott** is a village located in the Town of Union, Broome County, New York, with a population of 13,667 residents (2020 census).

86.     Plaintiff operates a public water system and has a duty to exercise due care and diligence in the maintenance and supervision of all sources of the public water system to prevent, so far as possible, its pollution and depletion, pursuant to 10 NYCRR § 5-1.71.

87.     As a public water supplier, Plaintiff has a duty to take the necessary steps to ensure the protection of the public health, including the undertaking of remedial feasibility studies and the installation of a suitable treatment process, pursuant to 10 NYCRR § 5-1.51.

88.     Plaintiff has been providing potable water to Endicott residents for over 100 years.

89.     In carrying out its powers, purposes and duties, the Village is acting in all respects for the benefit of the people of the Village, for the protection of their health, welfare and prosperity, as mandated by applicable laws and regulations.

**Defendant**

90.     **International Business Machine Corporation,** currently doing business as **IBM,** was and is a duly organized domestic corporation authorized to do business in the State of New York, with its principal place of business located at 1 Orchard Road, Armonk, New York.

91.     IBM is an American multinational technology company headquartered in Armonk, New York and present in over 175 countries.

92.     IBM operated the site/campus in Endicott, New York from approximately 1911 to 2002, which was known as the IBM Campus.  The campus was located at 1701 North Street, Endicott, NY 13760. This was a 135-acre facility lying along and on both sides of a railroad corridor in the village in the town.  The central portion of the facility is located approximately at the intersection of McKinley Avenue and the railroad in the Village. Portions of the facility also extend westward to Robble Avenue, northward to Watson Boulevard, eastward to Harding Avenue and southward to south of North Street.

93.      Over that time, IBM became the world's dominant computing platform, with the company producing 80 percent of computers in the United States and 70% of computer worldwide.

94.     IBM entered the microcomputer market in the 1980's with the IBM Personal Computer, which soon became known as the "PC."

95.     On information and belief, IBM performed manufacturing, research and development at the abovementioned location. IBM's work included a circuit board assembly operation that included liquid cleaning agents.

96.     Waste material generated from IBM's operations at the campus included numerous chemicals and solvents.

97.     After reported spills and leaks, groundwater testing conducted at the site in 1979 confirmed the presence of 1,4-Dioxane and other toxic chemicals in each of the monitoring wells.

98.     The hazardous and toxic substances released at the above property contained 1,4-Dioxane,  PFAS and other toxic chemicals.  They infiltrated the groundwater, which migrated off-site, contaminating Plaintiff's drinking water supply.

99.     IBM is liable for the actions, omissions and operations at the former IBM site/campus in Endicott, New York, which have contaminated and continue to contaminate Plaintiff's wells with 1,4- Dioxane, PFAS and other toxic chemicals.

100.     The hazardous and toxic substances released at the above property contained 1,4-Dioxane, PFAs and other toxic chemicals. 1-4, Dioxane, PFAS and other toxic chemicals infiltrated the groundwater, which migrated off-site, contaminating Plaintiff's drinking water supply.

101.     Defendant is the current and/or former owner and/or operator of industrial and commercial properties located within the capture zones of Plaintiff's supply wells.

102.     The Defendant's Site has been listed (Site Code 704014) on the New York Registry of Inactive Hazardous Waste Disposal Sites ("State Superfund") by the New York State Department of Environmental Conservation ("DEC") as Class 2 Site as a site at which "the disposal of hazardous waste has been confirmed and the presence of such hazardous waste or its components or breakdown products represents a significant threat to public health or the environment.[18]

---

[18] https://extapps.dec.ny.gov/cfmx/extapps/derexternal/index.cfm?pageid=3
https://dec.ny.gov/environmental-protection/site-cleanup/database-search/site-classifications

103.    On information and belief, hazardous substances, including but not limited 1,4-Dioxane, PFAS and/or products containing PFOS and PFOA, and other toxic chemicals were disposed, spilled, discharged, or otherwise released into the environment, including the groundwater from the properties operated and/or owned by Defendant.

104.    Groundwater migrating from the sites owned or operated by the Defendant or those sites where chemicals from the Defendant was disposed off has contaminated Plaintiff's wells.

105.    At all times relevant to this litigation, Defendant did business in New York as a supplier, consumer, user, handler and/ or disposer of hazardous substances (including but not limited to, 1,4-Dioxane, PFAS and/or products containing PFAS, and other toxic chemicals) at its facilities and/or properties, and/or said Defendant own or owned the properties upon which such actions and/or results occurred and from which hazardous substances, including but not limited to PFCs and other toxic chemicals were permitted to migrate and impact Plaintiff's wells.

106.    At all times relevant to this litigation, Defendant disposed, spilled, discharged, or otherwise released hazardous substances, including but not limited to, 1,4- Dioxane, PFAS and/or products containing 1,4-Dioxane, PFAS, and other toxic chemicals at their facilities and/or properties and/or said Defendant own or owned the properties at the time that such actions and/or results occurred, such that each Defendant knew or should have known that 1,4- Dioxane, PFAS and other chemicals would be released into the soil and groundwater and contaminate areas containing Plaintiff's water supply wells.

107.    As a direct result of Defendant's careless and negligent acts and omissions, 1,4-Dioxane, PFAS and other chemicals entered the soil and groundwater at their facilities and/or properties and contaminated the aquifer from which Plaintiff draws potable water to supply its customers.

108.    As a direct result of Defendant's acts and omissions, which are the sole and direct cause of Plaintiff's injuries, Plaintiff's wells have become contaminated with hazardous substances, including but not limited to 1,4- Dioxane, PFAS, and other toxic chemicals, causing damages to Plaintiff's property and requiring Plaintiff to incur costs, as described above.

109.    Defendant's wrongful actions and omissions, which are contributing to the presence of 1,4-Dioxane, PFAS and other toxic chemicals in Plaintiff's wells, are continuing and ongoing.

110.    Any and all references to a Defendant or Defendant in this Complaint include any and all predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendant IBM.

111.    When reference is made to any act or omission of Defendant, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of Defendant committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendant, and did so while acting within the scope of their employment or agency.

112.    Upon information and belief, the Defendant is responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and has caused and continues to cause injuries and damages to Plaintiff, either through Defendant's own conduct or through the conduct of its agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

**AS AND FOR FIRST CAUSE OF ACTION:**
**COST RECOVERY PURSUANT TO CERCLA § 107(a)**

113.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

114.    Defendant is a "persons" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

115.    Defendant is an "owner" and/or "operator" within the meaning of Section 101(2) of CERCLA, 42 US.C. § 9601(20).

116.    Defendant's sites are "facilities" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

117.    There have been numerous releases and disposal of hazardous substances at the above facilities within the meaning of Sections 101(22), 101(29) and 101(14) of CERCLA, 42 U.S.C. § 9601(14).

118.    The hazardous substances released and/or disposed of at Defendant's facilities have impacted and contaminated the groundwater, including groundwater which supplies Plaintiff's wells.

119.    The hazardous substances released and/or disposed of at Defendant's facilities contained 1,4-Dioxane.

120.    Plaintiff has incurred and will incur response costs to investigate, test, monitor, install, operate and maintain treatment systems, and take other measures to address the contamination of its property and its drinking water supply with 1,4-Dioxane and PFAS.

121.    Plaintiff's response costs are consistent with the National Contingency Plan, 40 C.F.R. Part 300.

122.    Pursuant to Section 107(a) of CERCLA, 42 U.S.C. §9607(a), Defendant is liable for all remedial and response costs incurred and to be incurred by Plaintiff in connection with the contamination of its wells with 1,4-Dioxane and PFAS.

**AS AND FOR A SECOND CAUSE OF ACTION: DECLARATORY JUDGMENT**

**PURSUANT TO CERCLA SECTIONS 9607(A)(4)(B) AND 9613(G)(2)**

123.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

124.    Plaintiff will continue to incur additional remedial and response costs, including but not limited to costs to investigate, test, monitor, design, install, operate and maintain treatment systems, and take other measures to address the contamination of its property and its drinking water supply with 1,4-Dioxane, PFAS and other toxic chemicals.

125.    Plaintiff's future costs will be consistent with the National Contingency Plan, 40 C.F.R. Part 300.

126.    Plaintiff is entitled to a declaratory judgment, pursuant to CERCLA Sections 9607(a)(4)(B) and 9613(g)(2) and 28 U.S.C. §2201(a), holding Defendant responsible for all further remedial and response costs or damages that will be incurred by Plaintiff in connection with the above claims.

**AS AND FOR A THIRD CAUSE OF ACTION: PUBLIC NUISANCE**

127.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

128.    Defendant has purchased, transported, used, processed, mixed, stored, handled and/or disposed of 1,4-Dioxane, PFAS and/or own properties from which 1,4-Dioxane, PFAS has been and continues to be released, in a manner that created a public nuisance and that unreasonably endangers or injures the property, health, safety and comfort of the general public and Plaintiff, causing inconvenience and annoyance.

129.    Defendant, by its negligent, reckless and willful acts and omissions set forth above,

have, among other things, unleashed massive, long-lasting and continually spreading plumes of contaminated groundwater, containing, 1,4-Dioxane, PFAS and other toxic chemicals. This contamination has migrated into the aquifer from which Plaintiff draws its water for its wells.

130.    By its conduct, Defendant violated and/or endangered the public right to pure drinking water, including reserves of unpolluted groundwater.

131.    Defendant's conduct has also injured the property, health, safety and/or comfort of a considerable number of persons.

132.    1,4-Dioxane, PFCs and other toxic chemicals, constitute an immediate, as well as prospective, public nuisance.

133.    As an owner of water production wells and a purveyor of drinking water, Plaintiff suffers injuries different in kind from the community at large precisely because it relies upon production wells for its functions.

134.    Plaintiff's production wells are entirely dependent upon groundwater.

135.    As a direct and proximate result of Defendant's acts and omissions creating the above-described nuisance, Plaintiff has suffered injuries common to the public at large and additional special injuries from actual and threatened contamination of groundwater supplying Plaintiff's production wells.

136.    Plaintiff's special injuries include: investigative costs, additional testing costs, planning, design and treatment costs, operation and maintenance of treatment systems, the potential need to install replacement wells, attorney fees and costs, loss of water production capacity, and loss of consumer confidence arising out of the increasingly widespread public perception —unfortunately based on actual fact—that the underground aquifers, groundwater and well water have been rendered less certain, safe and reliable than other sources of water.

137.    Defendant knew or, in the exercise of reasonable care, should have known, that the

release of PFCs and other toxic chemicals into the subsurface would unreasonably and seriously endanger, injure and interfere with the ordinary comfort, use and enjoyment of vital groundwater resources relied upon by Plaintiff and the public.

138.    As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

## AS AND FOR A FOURTH CAUSE OF ACTION: NEGLIGENCE

139.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

140.    Defendant knew or should have known that 1,4-Dioxne, PFAS and 1,4-Dioxane and PFAS containing products, and other toxic chemicals, create a substantial risk of harm to groundwater and to members of the public who consume such groundwater.

141.    Defendant knew or should have known that the chemicals containing 1,4-Dioxane, PFAS and other toxic substances that they were distributing, purchasing, transporting, using, processing, mixing, storing, handling and/or disposing create a substantial risk of harm of contaminating the soil, groundwater, the aquifers and specifically Plaintiff's water supply wells.

142.    Defendant negligently distributed, stored, transported, and/or disposed of, or willfully, wantonly, and intentionally spilled, disposed of, or otherwise permitted the release of 1,4-Dioxnae, PFAS at and from their facilities and/or properties so as to cause severe contamination of soil, groundwater, and/or the aquifer, and/or said Defendant own or owned the properties upon which such actions and/or results occurred.

143.    Defendant owed Plaintiff a duty to act as reasonable operators and/or owners of property and to take all necessary precautions to prevent the release of 1,4-Dioxane, PFAS and other toxic chemicals into the soil and groundwater at their properties.

144.    Defendant owed Plaintiff a duty to exercise reasonable care in the purchasing, transporting, using, processing, mixing, storing, handling and/or disposing of 1,4-Dioxane, PFAS and/or in owning property upon which the above-referenced actions and/or results occurred to take reasonable measures to prevent the release and spread of 1,4-Dioxane, PFAS and other toxic chemicals into the aquifer and into Plaintiff's supply wells.

145.    Defendant owed Plaintiff a duty to act as reasonable operators and/or owners of property and to take all necessary steps to prevent the continuing and future release of 1,4-Dioxane, PFAS from their facilities and/or properties.

146.    Upon learning of a release of solvents and compounds, including but not limited to 1,4-Dioxane and PFAS containing products, 1,4-Dioxane and PFAS and other toxic chemicals, at their facilities and/or properties, Defendant owed Plaintiff a duty to act reasonably to remediate, contain, and eliminate the release before it contaminated the aquifer and reached Plaintiff's supply wells.

147.    Defendant breached the above duties and failed to prevent the releases of PFAS containing products at their properties.

148.    Defendant also failed to take reasonable, adequate and sufficient actions to eliminate, correct, or remedy the releases of 1,4-Dioxane, PFAS and other toxic chemicals after they occurred.

149.    Defendant continues to breach their duties to remediate and prevent ongoing and future releases of 1,4-Dioxane, PFAS and other toxic chemicals from their properties into the groundwater that flows towards and is continuing to impact Plaintiffs' supply wells.

150.    As a result of Defendant's breaches of their duties, Plaintiff has expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendant's contamination for many years into the future.

151.    Defendant's breach of their duties was the direct, sole and proximate cause of Plaintiff's damages.

152.    As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

## AS AND FOR A FIFTH CAUSE OF ACTION: FAILURE TO WARN

153.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

154.    Defendant breached their duty to warn Plaintiff of the likelihood of release of hazardous substances, including but not limited to 1,4-Dioxane, PFAS and other toxic chemicals, at and in the vicinity of Defendant's facilities, and, consequently, in the capture zone of Plaintiff's wells.

155.    Upon learning of the release of hazardous substances, including but not limited to PFAS and/or products containing 1,4-Dioxane,  PFAS, and other toxic chemicals at their facilities and/or properties, Defendant owed Plaintiff a duty to timely notify and warn Plaintiff of the releases.

156.    Defendant breached that duty by failing to timely notify and warn Plaintiff of the releases of hazardous substances, including but not limited to 1,4-Dioxane, PFAS and other toxic chemicals, on and under their properties and, consequently, in the capture zone of Plaintiff's wells.

157.    As a result of Defendant's breaches of their duty to warn Plaintiff, Plaintiff was forestalled from undertaking effective and immediate remedial measures, and Plaintiff has expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendant's negligence for many years into the future.

158.    As a direct and proximate result of Defendant's above-described failure to provide

warnings, Plaintiff has incurred and will continue to incur the following damages:

    a.   Existing contamination of Plaintiff's wells, which may have been prevented or mitigated if timely warnings had been given;

    b.   Costs of additional testing and monitoring of the groundwater, aquifer system and Plaintiff's production wells for hazardous substances, including but not limited to PFAS and other toxic chemicals' contamination.

    c.   Costs of investigations, risk assessment and planning mitigation measures to address the contamination by hazardous substances, including but not limited to PFCs and other toxic chemicals;

    d.   Costs of treatment for hazardous substances, including but not limited to 1,4-Dioxane, PFAS and other toxic chemicals, including design, installation and operation of GAC systems to remove 1,4-Dioxane and PFAS to safe level of non-detect;

    e.   Loss of water-production capacity,

    f.   Diminished consumer confidence in Plaintiff's water;

    g.   Potential cost to design and install replacement wells;

    h.   Attorneys fees and costs, and

    i.   Other compensatory damages.

159.    As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

## AS AND FOR A SIXTH CAUSE OF ACTION: TRESPASS

160.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

161.    Defendant's negligent, reckless, willful and/or wanton actions and/or intentional failures to act caused hazardous substances (including but not limited to 1,4-dioxane, PFAS and other toxic chemicals) to be spilled, disposed of, or otherwise released into the soil, groundwater, and aquifer at Defendant's facilities and/or properties.

162.    Defendant's willful, wanton, and intentional failure to act and/or their affirmative

choice of action and result of following their course of action caused hazardous substances (including but not limited to 1,4-Dioxane, PFAS and other toxic chemicals) to enter and trespass upon the land and realty of Plaintiff and cause an injury to their possession and/or right of possession.

163.    Defendant took affirmative, reckless, voluntary, and intentional actions to store and/or dispose of hazardous substances (including but not limited to 1,4-Dioxane, PFAS and/or 1,4-Dioxane and PFAS containing products, and other toxic chemicals) improperly and in violation of applicable rules, regulations, law, statutes, guidelines.

164.    Further, after such acts, Defendant undertook affirmative, reckless, voluntary, and intentional acts that were insufficient to remedy the condition caused by the release of products containing hazardous substances (including but not limited to 1,4-Dioxane, PFAS and other toxic chemicals).

165.    At the time the above described affirmative, voluntary, and intentional acts were performed, Defendant had good reason to know or expect that hazardous substances (including but not limited to 1,4-Dioxane, PFAS and other toxic chemicals) would pass through the soil, groundwater, and aquifer under Defendant's properties and impact Plaintiff's supply wells.

166.    The above-described affirmative, voluntary, and intentional acts were performed with the willful intent and/or reckless disregard for the fact that hazardous substances (including but not limited to PFAS and other toxic chemicals) would be disbursed through the soil, groundwater, and aquifer under Defendant's properties and impact Plaintiffs' supply wells.

167.    These voluntary actions resulted in the immediate and continued trespass, injury and damage to Plaintiff, its public supply wells and related infrastructure and its right of possession to clean, uncontaminated drinking water for its customers.

168.    Further, Defendant's actions in disposing of hazardous substances, including but

not limited to 1,4-Dioxane, PFAS and other toxic chemicals into the soil and groundwater were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiff's customers' rights, health and property.

169.     Additionally, and/or alternatively, Defendant's decision to delay, and the resulting delay, in taking appropriate affirmative action to eliminate, correct, and/or remedy the contamination of the soil, groundwater, and aquifer at their facilities and/or properties—after having knowledge and notice of said contamination, were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiff's customers' rights, health and property.

170.     The trespass to Plaintiff's property is ongoing and is expected to continue as long as 1,4-Dioxane and PFAS continues to contaminate Plaintiff's wells.

171.     As a direct result of the foregoing, Plaintiff seeks compensatory damages, in a sum to be determined by a jury at the time of trial.

## PUNITIVE DAMAGES

172.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

173.     The conduct of Defendant, including but not limited to:

a. issuing no warnings and failing to divulge material information concerning the toxic nature, disposal, discharge and release of hazardous substances (including but not limited to 1,4-Dioxane, PFAS and/or PFAS containing products and other toxic chemicals which had a latent danger of impacting the groundwater supplying Plaintiff's drinking water); and

b. knowing of the certainty of long-lasting water contamination, including specifically high risks to aquifers, groundwater from hazardous substances (including but not limited to PFAS containing products and other toxic chemicals)

but nevertheless discharging these and causing great harm to Plaintiff, demonstrates an outrageous conscious disregard of Plaintiff and its customers' safety with implied malice and oppression for which punitive and exemplary damages should be imposed.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for a judgment against these Defendant for:

1.    Compensatory damages that exceed the jurisdictional limit of this Court;

2.    Punitive damages that exceed the jurisdictional limit of this Court;

3.    Reasonable fees for attorneys and expert witnesses;

4.    Costs and disbursements of this lawsuit;

5.    Interest on the damages according to law; and

6.    Any other and further relief as the Court deems just, proper and equitable.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims asserted in this Complaint.

Dated:  New York, New York
        December 3, 2024

                         **NAPOLI SHKOLNIK**


                         By: _____
                              Joseph P. Napoli, Esq.
                              360 Lexington Avenue, 11th Floor
                              New York, New York 10017
                              Telephone: 212-397-1000
                              Fax: 646-843-7603
                              jnapoli@napolilaw.com

By:    _____

           Stephen J. Maloney, Jr., Esq.
           360 Lexington Avenue, 11th Floor
           New York, New York 10017
           Telephone: 212-397-1000
           Fax: 646-843-7603
           smaloney@napolilaw.com


By:    _/s/ Paul J. Napoli_____

           Paul Napoli, Esq.
           1302 Avenida Ponce de Leon
           Santurce, Puerto Rico 00907
           Telephone: 787-493-5088
           pnapoli@nsprlaw.com