USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/06/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE VILLAGE OF ENDICOTT,

                                        Plaintiff,

        -against-

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                                        Defendant.

No. 24-CV-9242 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

Plaintiff Village of Endicott (the "Village" or "Plaintiff") brings this action against Defendant International Business Machines Corporation ("IBM" or "Defendant") asserting claims under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), as well as various state law claims, including negligence, failure to warn, public nuisance, and trespass. The Village alleges that IBM contaminated its groundwater and municipal wells—Wells 5, 28, and 32—with hazardous substances, including 1,4-Dioxane and per-and polyfluoroalkyl substances ("PFAS"), through its operations at its former headquarters. Pending before the Court is IBM's motion to dismiss the Village's First Amended Complaint ("FAC"). (ECF No. 24.) IBM seeks dismissal of the FAC pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

For the following reasons, IBM's motion to dismiss is GRANTED in part and DENIED in part.

**FACTUAL BACKGROUND**

The following facts are drawn from the FAC, (ECF No. 23), and are assumed as true for the purposes of this motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[1]

## I.    The Village, Its Water System, and IBM's Industrial Campus

The Village is located in the Town of Union, Broome County, New York, with a population of 13,667 residents. (FAC ¶ 23.) It operates a public water system that serves approximately 46,000 residents through roughly 14,500 service connections. (*Id*. ¶¶ 8, 24.) The public water system relies on several groundwater supply wells, including Wells 5, 28, and 32 (Well 32 is also known as the "Ranney Well"), which draw water from aquifers underlying the Village. (*Id*. ¶¶ 9–10.) Pursuant to 10 NYCRR § 5-1.71, the Village is obligated to maintain and supervise all sources of the public water system to prevent, among other things, pollution and depletion. (*Id*. ¶ 24.)

The Village is best known as the "[b]irthplace of IBM," a duly organized domestic corporation authorized to do business in New York, with its current principal place of business at 1 Orchard Road, Armonk, New York. (*Id*. ¶¶ 29, 111.) From approximately 1911 to 2022, however, IBM operated a large industrial and manufacturing campus in the Village (the "Campus"). (*Id*. ¶ 31.) The Campus hosted a wide range of industrial activities, including the manufacture of calculating machines, typewriters, printed circuit boards, and computer components, as well as other manufacturing, research, and development operations. (*Id*. ¶¶ 34–36.) IBM's operations included circuit board assembly processes that utilized liquid cleaning agents and chemical solvents. (*Id*. ¶ 36.) According to the FAC, all of IBM's operations at the Campus produced waste material, including numerous chemicals and solvents. (*Id*. ¶ 37.)

---

[1] The Court also considers and takes judicial notice of the publicly available reports and information related to the Village Superfund Site. *See Lewis v. Del. Charter Guarantee & Tr. Co.*, 2015 WL 1476403, at *10 n.11 (E.D.N.Y. Mar. 31, 2015) ("[C]ourts that consider matters of public record in a Rule 12(b)(6) motion are limited to things such as . . . letter decisions of government agencies, published reports, records of administrative agencies, or pleadings in another action."), *aff'd as modified*, 642 F. App'x 23 (2d Cir. 2016).

The Village alleges that, over the course of decades, IBM's operations at the Campus resulted in the release of hazardous substances into the environment through spills, leaks, and improper disposal practices. (*Id*. ¶¶ 5, 38, 53.) Among the substances allegedly released were 1,4-Dioxane and PFAS. (*Id*. ¶¶ 14, 16.) For instance, the Village alleges that IBM incorporated PFAS and other toxic substances in its chip-making processes until 2010. (*Id*. ¶¶ 42–44.) These substances were regularly purchased, transported, used, processed, stored, and handled by IBM on the Campus. (*Id*. ¶ 5.) The Village further alleges that these substances are hazardous to the environment and potentially harmful to human health. (*Id*. ¶ 6.)

As another example, the Village alleges that, in December 1979, IBM inadvertently released approximately 4,100 gallons of 1,1,1-Trichloroethane ("TCA"), a substance stabilized with 1,4-Dioxane, into the environment. (*Id*. ¶ 119.) In response, the Village contracted a third-party engineering firm to conduct a hydrogeological investigation in 1980, installing 52 observation wells to assess whether contaminants had infiltrated the groundwater. (*Id*. ¶ 120.) Sampling from six of the observation wells detected the presence of various chemicals, including TCA, Trichloroethylene ("TCE"), Perchloroethylene ("PCE"), and Benzene. (*Id*. ¶¶ 120–21.) As a result of this spill, a solvent pool, consisting largely of TCA, migrated into the Village aquifers. (*Id*. ¶ 122.)

The Village likewise alleges that IBM disposed of industrial sludges and other toxic substances at a landfill located within the Village, which contributed to pollution of Well 32. (*Id*. ¶¶ 112, 115, 133.) The Village, however, operated the landfill from approximately 1950 until 1977. (*Id*. ¶ 112.) Well 32 operated without incident until May 1981, when, during a routine inspection conducted by the Environmental Protection Agency ("EPA"), vinyl chloride and other volatile organic compounds were detected. (*Id*.) Purge wells were subsequently installed to remove

contaminated water.  (*Id.*)  Because of contamination from several hazardous substances, the EPA proposed in 1984 that certain areas of the Village be designated as a "Superfund Site."  *See* U.S. Env't Prot. Agency, *Endicott Village Well Field Superfund Site*, (June 10, 1986), https://semspub.epa.gov/work/02/363580.pdf.  The site would comprise "the land associated with" the Village landfill, as well as the En-Joie Golf Course, the facilities of the Village's "Seage [sic] Treatment Plant," and "the Ranney Well (Well 32) and its zone of influence on area groundwater." (FAC ¶ 116.)  These areas were formally designated as a federal Superfund Site in 1986.  *See*  U.S. Env't Prot. Agency, *National Priorities List (NPL) Sites—by State*, https://www.epa.gov/superfund/national-priorities-list-npl-sites-state#NY.

To no surprise, an EPA Record of Decision, issued on September 30, 1992, named IBM as a potential responsible party ("PRP") for Well 32's contamination. *See* U.S. Env'. Prot. Agency, *Record of Decision: Endicott Village Well Field Superfund Site, Endicott, N.Y.* (Sept. 30, 1992), at Fact Sheet, https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=9100SCEW.TXT.  A PRP is any person, including a municipality, that is or was an owner, operator, transporter, or generator potentially responsible for or contributing to a spill or other contamination at a Superfund site.  *See* 42 U.S.C. §§ 9601(18), (21), 9607(a).  The same Record of Decision also identified the Village as a PRP.  *Endicott Village Well Field ROD* (Sept. 30, 1992), *supra*, at Fact Sheet.

## II.    Well Contamination, Remediation, and Ongoing Impacts

Despite the Village's ongoing efforts, Well 32 continued to experience contamination.  In the late 1980s, the New York State Department of Environmental Conservation ("DEC"), in cooperation with the EPA, began conducting studies to determine the source of contamination in the Village.  (FAC ¶ 113.)  Those studies concluded that the most probable source of contamination to Well 32 was the Village landfill, although the results were not conclusive.  (*Id.*)  As a result, on

September 19, 1988, IBM, the Village, and the Town of Union executed an administrative order on consent to conduct additional remedial studies. (*Id*. ¶ 114.) The EPA was also a party to the consent order.[2] (*Id*. ¶¶ 114–15.) These studies, undertaken by IBM's consultants, identified the need for further remedial measures to address a groundwater plume originating at the landfill. (*Id*. ¶ 114.) To address the contamination, IBM installed air strippers at the Ranney Well in 1991 and a supplemental purge well in 1995. (*Id*. ¶ 115.) The EPA subsequently intervened in October 1996, requiring the Village to cap most of the landfill surface, resulting in the containment of approximately eight million tons of waste. (*Id*.)

Contamination continued despite prior interventions, and in 2002, the Village identified a large chemical plume affecting homes and offices south of the Campus. (*Id*. ¶ 123.) The principal chemical responsible for the vapor was TCE, another substance linked to potential harm to human health. (*Id*.) In response, IBM entered into a formal consent order with the DEC in 2004 to investigate and remediate the contamination. (*Id*. ¶ 124.) IBM's investigation confirmed that it had inadvertently released 4,100 gallons of TCA in December 1979. (*Id*. ¶ 125.) In 2008, while expanding its Campus, IBM also discovered soil contaminated with various chemicals, including TCA, and subsequently removed 780 tons of soil. (*Id*. ¶¶ 126–127.)

Because of the 1,4-Dioxane and PFAS contamination, the Village ultimately took Wells 5 and 28 offline in December 2020. (*Id*. ¶ 10.) To maintain its water supply, the Village alleges that it has been forced to purchase water from a neighboring municipality, incurring costs exceeding $1 million to date. (*Id*. ¶ 16.) The FAC further alleges that such arrangements are limited and may

---

[2] IBM contends that the Village entered into several settlement agreements with the EPA concerning its CERCLA liability. (Def. Mem. at 16.) The Village does not appear to dispute this. Although neither party addresses the issue directly, consent decrees and administrative orders on consent entered into with the EPA are generally understood to constitute settlements that resolve a party's CERCLA liability. *See* 42 U.S.C. §§ 9613(f)(3)(B), 9622. The Village entered into at least one consent decree with the EPA concerning its liability of Well 32 in 1988. *See* Fifth Five-Year Review Report for Endicott Village Well Field Superfund Site (Dec. 22, 2020), https://semspub.epa.gov/work/02/616047.pdf.

be subject to future price increases.  (*Id*. ¶¶ 17–19.)  In addition, the Village has acquired property for the development of a new groundwater well, which it estimates will cost $12 million to construct.  (*Id*. ¶ 20.)

After Wells 5 and 28 were taken offline, the Village continued to test them for the presence of contaminants. In 2021, it detected 1,4-Dioxane at levels exceeding regulatory limits.  (*Id*. ¶ 128.) Similar results were reported from 2020 through 2024, and PFAS were also detected in both wells at levels exceeding regulatory limits.  (*Id*. ¶¶ 129, 138.)  Subsequent testing has continued to detect contaminants in Well 32, the Village's remaining operational well, including 1,4-Dioxane at levels approaching regulatory limits.  (*Id*. ¶¶ 11, 133.)  Consequently, the Village alleges that it has incurred, and will continue to incur, substantial costs associated with investigating the contamination, monitoring water quality, designing and installing treatment systems, and securing alternative water sources—costs the Village attributes to IBM's historical operations and the alleged release of hazardous substances from the IBM Campus.  (*Id*. ¶¶ 15, 21–22, 54–56.)

**PROCEDURAL HISTORY**

The Village commenced this action on December 3, 2024.  (ECF No. 1.)  Shortly thereafter, on February 26, 2025, IBM filed a pre-motion conference letter concerning a contemplated motion to dismiss.  (ECF No. 14.)  IBM subsequently served its motion to dismiss on April 7, 2025. (ECF No. 14.)  Three weeks later, on May 13, 2025, the Village filed the FAC.  (ECF No. 23.)  On July 28, 2025, IBM moved to dismiss the FAC.  (ECF No. 24.)  The Village opposed the motion, (ECF No. 25), and IBM filed a reply in further support.  (ECF No. 26.)  The Court thereafter granted leave for additional briefing, permitting the Village to file a sur-reply and IBM to file a sur-sur-reply.  (ECF Nos. 30, 34.)  The Village filed its sur-reply on August 11, 2025, (ECF No. 32), and IBM filed its sur-sur-reply on August 14, 2025.  (ECF No. 35.)

6

**LEGAL STANDARD**

### I.    Federal Rule of Civil Procedure 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it." *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011) (citation and internal quotations omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). In assessing whether there is subject matter jurisdiction, the Court must accept as true all material facts alleged in the complaint. *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009). Without jurisdiction, the Court is devoid of the "power to adjudicate the merits of the case," and for that reason, a court must decide a Fed. R. Civ. P. 12(b)(1) motion before any motion on the merits. *Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 55 (2d Cir. 2016).

### II.    Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).

7

The Second Circuit "deem[s] a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . . and documents that plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rotham v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (internal citations omitted).  The critical inquiry is whether a plaintiff has pled sufficient facts to nudge their claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

IBM moves to dismiss the FAC on several independent grounds.  First, IBM contends that CERCLA bars all of the Village's claims because the alleged contamination arises from a federally designated Superfund Site subject to ongoing EPA-directed remediation, and the Village, as a PRP, cannot undertake additional remedial action absent EPA authorization.  (ECF No. 24, Ex. 1, "Def. Mem.," at 10–12.)  IBM further argues that, for this reason, the Village lacks Article III standing because its alleged injuries are not redressable and that its state law claims are preempted by CERCLA.  (*Id*. at 12–14.)  Second, IBM asserts that the Village's CERCLA claims are improperly pleaded under § 107(a) and, in any event, are time-barred when brought under the proper provision, § 113(f).  (*Id*. at 14–19.)  Third, IBM argues that the FAC fails to state viable state law claims, including negligence and failure to warn.  (*Id*. at 19–21.)  Finally, IBM contends that the Village seeks impermissible double recovery in light of prior settlements relating to PFAS contamination. (*Id*. at 21–25.)  The Court addresses each argument in turn.

## I.    The Village's CERCLA Claims

The Village alleges that the IBM Campus contaminated Wells 5, 28, and 32 with hazardous substances during its period of operation.  (FAC ¶ 46.)  The Village now seeks reimbursement for the costs of remedial efforts associated with that pollution.  (*Id*. ¶¶ 15, 21–22, 54–56.)  However, before the Court addresses the parties' arguments, it must first determine which CERCLA provisions govern the Village's claims.

### A.  CERCLA's Statutory Framework and Available Remedies

CERCLA was enacted in 1980 to respond to the environmental and health risks posed by the release of hazardous substances into the environment.  *See Revitalizing Auto Communities Env't Response Tr. v. Nat'l Grid USA*, 92 F.4th 415, 438 (2d Cir. 2024) (citing *Burlington Northern and Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009)).  CERCLA's purpose is to "assur[e] that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions."  *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120 (2d Cir. 2010) (quoting S. Rep. No. 96-848, at 13 (1980)).  To that end, CERCLA directs the EPA to compile a prioritized list of contaminated sites—commonly known as Superfund Sites—and authorizes the agency to undertake cleanup efforts itself or compel responsible parties to do so.  *See Atl. Richfield Co. v. Christian*, 590 U.S. 1, 6 (2020) (citing 42 U.S.C. §§ 9604, 9605, 9606, 9615).  In this way, CERCLA "promote[s] the 'timely cleanup of hazardous waste sites' and to ensure that the costs of such cleanup efforts [are] borne by those responsible for the contamination."  *Burlington Northern*, 556 U.S. at 602 (quoting *Consolidated Edison Co. of New York, Inc. v. UGI Utilities, Inc.*, 423 F.3d 90, 94 (2d Cir. 2005)).

CERCLA § 122(e)(6) provides that, once the EPA initiates a remedial investigation and feasibility study for a particular facility, no potentially responsible party may undertake any remedial action at that facility absent authorization from the President.  *See* 42 U.S.C. § 9622(e)(6).

The President, however, delegated this authority to the EPA, giving the agency sole discretion to authorize remedial actions. *See* Exec. Order No. 12,580, 52 Fed. Reg. 2923 (Jan. 29, 1987). The purpose of § 122(e)(6) is to ensure that the government can avoid "inconsistent response actions" at contaminated sites subject to CERCLA oversight. *See* 42 U.S.C. § 9622(e)(6) (alteration in original). CERCLA defines the term "facility" as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . ." 42 U.S.C. § 9601(9)(B). Although CERCLA does not define "Superfund Site," the Supreme Court has recognized that § 122(e)(6) applies to such sites. *See Atl. Richfield Co.*, 590 U.S. at 21 (2020).

The parties dispute which CERCLA provisions govern the Village's claims. The Village contends that its claims arise under § 107(a) because it seeks reimbursement for costs incurred in removing alleged hazardous substances from Wells 5, 28, and 32 that originated from the IBM Campus. (ECF No. 25, "Pl. Opp.," at 2.) CERCLA § 107(a) "authorizes the United States, a state, or 'any other person' to seek reimbursement for all removal or remedial costs associated with [ ] hazardous materials on the property" if the response actions are consistent with the "federal government's roadmap for responding to the release of hazardous substances." *Niagara Mohawk*, 596 F.3d at 120 (citing 42 U.S.C. § 9607(a)(4)). "Any person" includes a "PRP that voluntarily cleans the site." *Id*. at 121. Where a PRP has incurred cleanup costs pursuant to a settlement, it cannot pursue a cost-recovery claim under § 107(a). *See id*. at 121–22; *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 138 (2007). It follows that CERCLA § 107(a) permits a party to seek repayment of cleanup costs from "any person" who, at the time of disposal of any hazardous substance, owned or operated any facility at which such hazardous substances were disposed of, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances, or accepted any hazardous substances for transport to disposal

10

or treatment facilities. 42 U.S.C. § 9607(a)(2)–(4). "Section 107 allows for complete cost recovery under a joint and several liability scheme; one PRP can potentially be accountable for the entire amount expended to remove or remediate hazardous materials." *Niagara Mohawk*, 596 F.3d at 121.

By contrast, IBM contends that the Village is barred from seeking reimbursement under CERCLA § 122(e)(6) because it failed to obtain EPA authorization. (Def. Mem. at 10–14.) Specifically, IBM argues that, because Wells 5, 28, and 32 are included in the Superfund Site, (*see id*.), the Village must obtain EPA authorization before undertaking any remedial action. *See* 42 U.S.C. § 9622(e)(6). IBM further contends that the Village—as a PRP that has entered into settlements with the EPA concerning the Superfund Site—may pursue claims only under CERCLA § 113(f)(3)(B). (Def. Mem. at 2, 16.)

When CERCLA was first enacted, § 107 provided the only available remedy, leaving uncertainty as to whether PRPs, who themselves were liable for some cleanup costs, could invoke § 107 to seek contribution from other PRPs rather than full cost recovery. *Niagara Mohawk*, 596 F.3d at 121. Congress finally provided the express language necessary to authorize a contribution right under CERCLA with the Superfund Amendments and Reauthorization Act of 1986, adding § 113 to the statutory scheme. *Id*. CERCLA § 113(f)(3)(B) enables a party that has settled its CERCLA liability with the government, including in an "administrative or judicially approved settlement," to seek contribution from others not party to such a settlement. *Revitalizing Auto Communities Env't Response Tr.*, 92 F.4th at 439 (quoting 42 U.S.C. § 9613(f)(3)(B)). CERCLA § 113 is a "distinct" remedy from § 107 and applies "to parties in different procedural circumstances." *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 163 n.3 (2004); *see also Atl. Rsch. Corp.*, 551 U.S. at 137.

11

###### i.    Applicability of CERCLA Provisions to Well 32

###### 1.    CERCLA §§ 107(a) and 113(f)

The Court begins by analyzing which CERCLA provisions apply to Well 32.  As explained above, the EPA designated certain areas of the Village as a Superfund Site.  (FAC ¶ 116.)  Notably, those areas include "the land associated with" the Village landfill and "the Ranney Well (Well 32) and its zone of influence on area groundwater."  (*Id*.)  This designation followed the detection of several hazardous substances in Well 32, including vinyl chloride and other volatile organic compounds.  (*Id*. ¶ 115.)  The EPA concluded that the Village landfill was the most probable source of contamination to Well 32.  (*Id*. ¶ 113.)  Because the Village operated the landfill from approximately 1950 until 1977 and permitted IBM to dispose of alleged hazardous materials therein, the EPA designated the Village as a PRP in connection with the Superfund Site.  *Endicott Village Well Field ROD* (Sept. 30, 1992), *supra*, at Fact Sheet.  The Village subsequently entered into settlements with the EPA concerning its liability for the Superfund Site.  (*See, e.g.*, FAC ¶¶ 111–116.)  Under these circumstances, at least with respect to Well 32, the Village is barred from pursuing claims under CERCLA § 107(a).  As a PRP that has entered into settlements with the EPA concerning liability at the Superfund Site—which includes Well 32—the Village's exclusive remedy lies under CERCLA § 113(f)(3)(B).  That provision allows the Village to seek contribution from IBM, as IBM was not a party to the settlements with the EPA.  *See Revitalizing Auto Communities Env't Response Tr.*, 92 F.4th at 439 (quoting 42 U.S.C. § 9613(f)(3)(B)).

To avoid CERCLA § 113(f)(3)(B), the Village alleges that it "is not seeking relief for any costs related to the Endicott Village Well Field Superfund Site."  (FAC ¶ 117.)  Instead, the Village contends that it seeks reimbursement for removal costs associated with different hazardous substances—namely, 1,4-Dioxane and PFAS—that allegedly originated from the IBM Campus

12

rather than the landfill. (*Id*. ¶ 46.) The Village further asserts that the EPA designated Well 32 as part of the Superfund Site based on contamination from vinyl chloride and other volatile organic compounds, which are not the hazardous substances at issue here. (ECF No. 32, "Pl. Sur-Reply," at 1.) The Court is not persuaded.

The Village's argument fails to reconcile its characterization of the claimed costs with the undisputed fact that Well 32 is part of the Superfund Site and was the subject of the Village's settlements with the EPA. A party may not evade CERCLA's contribution framework through artful pleading that recharacterizes response costs as unrelated to a Superfund Site when those costs arise from the same site and potential contamination that formed the basis of its settled liability. Indeed, the Village is a PRP in connection with the Superfund Site because it permitted IBM to dispose of industrial waste at the landfill for nearly thirty years. *Endicott Village Well Field ROD* (Sept. 30, 1992), *supra*, at Fact Sheet. Congress recognized the need to provide a contribution remedy for PRPs similarly situated to the Village. *Niagara Mohawk*, 596 F.3d at 128. "To allow [the Village] to proceed under § 107(a) would in effect nullify the [ ] amendment [to CERCLA] and abrogate the requirements Congress placed on contribution claims under § 113." *Id*.; *see also Revitalizing Auto Communities Env't Response Tr.*, 92 F.4th at 440 (same).

The Village's argument is further undermined by Second Circuit precedent. Although the parties dispute whether the Village seeks remedial or removal costs, a distinction addressed below, the Court concludes that the actions at issue are properly characterized as remedial. The Second Circuit has expressly held that only one remedial action may occur at a single Superfund Site:

> We agree with the majority view and hold that there can only be one remedial action at a site. The very nature of a remedial action is to permanently remediate hazardous waste. . . . A remedial action is supposed to be a final, once-and-for-all cleanup of a site, and once a PRP completes an approved remediation plan, it would not be logical—or fair—to subject that entity to additional CERCLA lawsuits seeking yet additional permanent relief, although we recognize that what seems

13

final at a given point in time might come to appear inadequate at a later date as scientific knowledge progresses.

*New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 235 (2d Cir. 2014). The detection of hazardous substances in Well 32 resulted in the EPA designating it as a Superfund Site. In doing so, the EPA, in coordination with the Village, IBM, and the DEC, has undertaken efforts to remediate Well 32 of hazardous substances, including vinyl chloride, 1,4-Dioxane, and PFAS. In accordance with Second Circuit precedent, this Court "has barred suits to recover costs for subsequent remedial work at facilities where previous remedial work was [already] initiated." *See 105 Mt. Kisco Assocs. LLC*, 2017 WL 1194700, at *8 (S.D.N.Y. Mar. 30, 2017). Therefore, to the extent the Village seeks to recover costs associated with Well 32, its exclusive remedy lies in contribution under § 113(f), not cost recovery under § 107(a).[3]

### 2. CERCLA § 122(e)(6)

Despite this distinction, the Village's claims concerning Well 32 are procedurally barred under CERCLA § 122(e)(6). It is undisputed that Well 32 is part of the Superfund Site that has been the subject of EPA-directed investigation and response actions. (FAC ¶ 116.) Once the EPA has initiated a remedial investigation and feasibility study at a facility, "no potentially responsible party may undertake any remedial action at the facility unless such remedial action has been authorized by the President," an authority that has been delegated to the EPA. *See* 42 U.S.C. § 9622(e)(6); Exec. Order No. 12,580. Because the statute operates at the level of the facility—not individual contaminants—the Village cannot avoid its reach by recasting its claims as directed

---

[3] The Village's attempt to characterize itself as an "innocent landowner" with respect to contamination allegedly originating from the IBM Campus, while simultaneously acknowledging its status as a PRP in connection with the same groundwater system and Well 32, is incompatible with CERCLA's statutory framework. (Pl. Opp. at 2–3, 13.) CERCLA does not permit a party to evade its status as a potentially responsible party by recasting its claims based on alleged sources of contamination within a single, interconnected environmental system. *See Atl. Rsch. Corp.*, 551 U.S. at 138 (explaining that CERCLA §§ 107(a) and 113(f) provide two "clearly distinct" remedies). Because the Village's claimed costs arise from contamination affecting a system for which it bears responsibility, it cannot proceed under § 107(a) on an innocent landowner theory. Its exclusive remedy, if any, lies under § 113(f).

14

solely at 1,4-Dioxane or PFAS allegedly originating from the IBM Campus. This conclusion is reinforced by CERCLA's definition of "facility" as "any area where a hazardous substance . . . come[s] to be located." 42 U.S.C. § 9601(9).

In an effort to avoid the procedural bar imposed by CERCLA § 122(e)(6), the Village contends that it seeks costs associated with a removal action, rather than a remedial action. (Pl. Sur-Reply at 4.) It maintains that § 122(e)(6) applies only to remedial actions and thus does not preclude its claims. (*Id*. at 4–5.) As a threshold matter, however, the Village raises this argument for the first time in its sur-reply. The Village nevertheless alleges that IBM is liable for "all remedial and response costs" and is responsible for "all further remedial and response costs or damages." (FAC ¶¶ 151, 155.) The Village's opposition likewise does not assert that this is a removal action. (*See generally* Pl. Opp.) Raising such an argument for the first time in a sur-reply is improper. *See Arriaga v. Gage*, 2018 WL 1750320, at *8 n.14 (S.D.N.Y. Apr. 6, 2018) (explaining that facts asserted in a sur-reply but not in a complaint cannot be considered in deciding a motion to dismiss); *LLM Bar Exam, LLC v. Barbri, Inc.*, 2017 WL 4280952, at *21 (S.D.N.Y. Sept. 25, 2017) ("[A] complaint cannot be amended by the briefs in opposition to a motion to dismiss."). Notwithstanding this deficiency, the Court concludes that the Village's claims are remedial in nature.

CERCLA's cost-recovery provision distinguishes between two types of response actions: remedial and removal. *See MPM Silicones, LLC v. Union Carbide Corp.*, 966 F.3d 200, 214 (2d Cir. 2020), *as amended* (Aug. 13, 2020). "Remedial actions" are "generally long-term or permanent containment or disposal programs," *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1040 (2d Cir. 1985), undertaken "in the event of a release or threatened release of a hazardous substance into the environment" and "consistent with [a] permanent remedy." 42 U.S.C.

§ 9601(24). "Removal actions," by contrast, are "typically short-term cleanup arrangements," *Shore Realty*, 759 F.2d at 1040, undertaken in response to immediate threats to the environment. *See* 42 U.S.C. § 9601(23); *New York State Elec. & Gas*, 766 F.3d at 230 ("Removal actions are generally clean-up measures taken in response to immediate threats to public health and safety.").

With this legal framework in mind, the Village has been engaged in efforts to contain hazardous substances for decades. As to Well 32, it has undertaken multiple measures since the 1980s—including ongoing purification, decommissioning of wells, and coordination with state and federal agencies—to remove hazardous substances. (FAC ¶¶ 113–134.) Wells 5 and 28, which were decommissioned more than five years ago, are similarly implicated; however, nothing in the FAC suggests that the Village's efforts with respect to these wells have been short-term. (*Id.* ¶ 10.) For instance, the Village alleges that it plans to construct a new well, which will cost approximately $12 million. (*Id.* ¶ 20.) But "retiring contaminated wells and building an entirely new water supply system" is a remedial action. *New York v. Next Millenium Realty, LLC*, 732 F.3d 117, 128 (2d Cir. 2013), *as corrected* (Oct. 16, 2013).[4] The Village also concedes that its wells "require multi-million wellhead water treatment." (FAC ¶ 12.) But "[r]emoval measures tend to be shorter in duration and lower in cost than remedial measures, they are also "generally designed to address contamination at its endpoint and not to permanently remediate the problem." *105 Mt. Kisco Assocs.*, 2017 WL 1194700, at *8 (citation omitted). These decades-long, multi-step efforts are inconsistent with the short-term, immediate-response nature of a CERCLA removal action. *See New York State Elec. & Gas*, 766 F.3d at 230; 42 U.S.C. § 9601(23)–(24). The Village's claims

---

[4] The Village's reliance on *Next Millennium* is misplaced. There, the Second Circuit emphasized that the plaintiff's response did "not involve the provision of alternative water supplies." *Next Millenium Realty*, 732 F.3d at 128. Here, however, the Village alleges precisely that—namely, the construction of a new well at substantial cost. (FAC ¶ 20.) That distinction is dispositive. Efforts to replace contaminated infrastructure reflect a permanent, comprehensive response to contamination and therefore fall within the definition of remedial, not removal, actions. *See Next Millenium Realty*, 732 F.3d at 128 ("The GAC and air stripper tower were implemented as measures to minimize and mitigate the damage . . . rather than to permanently eliminate it.")

16

are long-term and remedial in nature because they seek permanent solutions and are therefore subject to CERCLA § 122(e)(6).[5]

### ii.   Applicability of CERCLA Provisions to Wells 5 and 28

Determining which CERCLA provisions govern Wells 5 and 28 is more nuanced. IBM contends that, because the Village alleges that Wells 5, 28, and 32 are all connected to the same aquifer, they must therefore be connected to the Superfund Site, which includes "Well 32[] and its zone of influence on area groundwater." (Def. Mem. at 15.) The Court finds this argument premature. At this juncture, the record is insufficient to conclude that Wells 5 and 28 are part of the Superfund Site. Whether Wells 5 and 28 fall within the Superfund Site's scope presents a fact-specific question that cannot be resolved on the pleadings. *See Wacker v. JP Morgan Chase & Co.*, 678 F. App'x 27, 30 (2d Cir. 2017) ("fact-specific questions cannot be resolved on the pleadings") (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012)); *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (holding that a court may not resolve factual disputes against a plaintiff on a motion to dismiss). It would be improper for the Court to determine, at this stage, whether Wells 5, 28, and 32 are sufficiently connected. The Court thus concludes that, for now, the Village's CERCLA claims with respect to Wells 5 and 28 may proceed under § 107(a).[6] The Court further concludes that, because Wells 5

---

[5] The Village's reliance on *ELG Utica Alloys, Inc. v. Niagara Mohawk Power Corp.*, 2023 WL 2655111, at *22 (N.D.N.Y. Mar. 27, 2023), *aff'd*, 144 F.4th 360 (2d Cir. 2025) is similarly misplaced. Although that court characterized source-directed excavation as remedial, it did not hold that only source removal qualifies as a remedial action. *Id.* Rather, the decision—consistent with *MPM* Silicones, 966 F.3d at 214—emphasizes that remedial actions are those aimed at providing a comprehensive and permanent solution to contamination. *ELG Utica Alloys*, 2023 WL 2655111, at *16. Here, the Village alleges precisely such measures, including significant infrastructure investment and the construction of a new well to replace contaminated water sources. (*See, e.g.*, FAC ¶¶ 12, 20.)

[6] Because it is premature to determine whether Wells 5 and 28 are connected to the Superfund Site, the Court concludes that CERCLA § 113(f)(3)(B) is inapplicable to the Village's claims concerning these wells. CERCLA § 113(f)(3)(B) applies only to PRPs that have settled their CERCLA liability with the government, including in an "administrative or judicially approved settlement," to seek contribution from others not party to such a settlement. *Revitalizing Auto Communities Env't Response Tr.*, 92 F.4th at 439 (quoting 42 U.S.C. § 9613(f)(3)(B)). However, at this juncture, the Village cannot be deemed a PRP with respect to Wells 5 and 28 where only Well 32 has been established as part of the

and 28 cannot at this stage be considered part of the Superfund Site, they are not subject to the procedural bar imposed by CERCLA § 122(e)(6).  *See Atl. Richfield Co.*, 590 U.S. at 21 ("§ 122(e)(6) applies only to sites on the Superfund list.").

### B.  The Village's CERCLA Claims

#### i.  Procedural Bar of the Village's CERCLA Claims

Having determined which CERCLA provisions govern the Village's claims, the Court now turns to the parties' arguments.  IBM first contends that the Village lacks Article III standing on the ground that it lacks EPA authorization under CERCLA § 122(e)(6).  (Def. Mem. at 12.)

A motion to dismiss for lack of Article III standing challenges the subject-matter jurisdiction of a federal court and is properly brought under Fed. R. Civ. P. 12(b)(1).  *See Carter v. HealthPort Techs. LLC*, 822 F.3d 47, 56 (2d Cir. 2016); *see also Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 44 (2d Cir. 2015) (standing is "threshold matter" in determining a district court's jurisdiction to hear the case).  When determining a motion to dismiss for lack of subject-matter jurisdiction, the Court must accept all factual allegations pled in the complaint as true.  *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006).  When faced with a motion asserting a combination of Rule 12(b) defenses, as IBM does here, the Court must first resolve any jurisdictional challenges, such as whether the Village has standing, before addressing whether the FAC sufficiently states a claim.  *See Hernandez v. Wonderful Co. LLC*, 2023 WL 9022844, at *4 (S.D.N.Y. Dec. 29, 2023).

To demonstrate Article III standing, a plaintiff must establish (1) an injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) redressability of the injury by a "favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  Relevant

---

Superfund Site.  At this stage, the Village may proceed under CERCLA § 107(a) with respect to Wells 5 and 28, subject to further factual development.

here, a plaintiff must show "a likelihood that the injury will be redressed by a favorable decision." *Bates v. Abbott Laboratories*, 727 F. Supp. 3d 194, 230 (N.D.N.Y. 2024) (cleaned up). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). When pursing claims "depend[ing] on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," a plaintiff is faced with a heightened burden. *State v. United States Dep't of Com.*, 315 F. Supp. 3d 766, 785 (S.D.N.Y. 2018) (quoting *Lujan*, 504 U.S. at 562). In such a case, "it becomes the burden of the plaintiff to adduce facts showing that" the choices of these independent actors "have been or will be made in such manner as to produce . . . permit redressability of injury." *Id*.

As discussed above, the Court concludes that the Village's claims with respect to Well 32 are governed by CERCLA § 122(e)(6). That statute provides that, once the EPA initiates a remedial investigation and feasibility study for a particular facility, no potentially responsible party may undertake any remedial action at that facility absent authorization from the President. *See* 42 U.S.C. § 9622(e)(6). The President has delegated that authority to the EPA. *See* Exec. Order No. 12,580. A Superfund Site satisfies the definition of "facility." *See Atl. Richfield Co.*, 590 U.S. at 21. Because the EPA designated Well 32 as a Superfund Site and has ordered investigations and studies to address the hazardous substances polluting Well 32, the Village would require EPA approval to undertake further remedial action. The Village's claims, at least with respect to Well 32, therefore lack standing because the Court cannot redress the alleged injury in the absence of EPA authorization.

However, the same is not true with respect to the Village's claims concerning Wells 5 and 28. Although IBM contends that Wells 5 and 28 are part of the Superfund Site, the Court concludes that this argument is premature at this juncture. "[F]act-specific questions cannot be resolved on the pleadings." *Wacker*, 678 F. App'x at 30; *Anderson*, 680 F.3d at 185. Before the Court can determine whether all three wells are interconnected, the Village should be afforded discovery to demonstrate the contrary *See Glob. Network Commc'ns*, 458 F.3d at 157 (explaining that the district court erred by resolving factual findings at the motion to dismiss stage). The Court therefore dismisses the Village's CERCLA claims for lack of Article III standing only to the extent they concern Well 32.

### ii.    Statutory Timeliness of the Village's CERCLA Claims

Remaining are the Village's CERCLA claims concerning Wells 5 and 28. Because the Court cannot determine at this time whether these wells are part of the Superfund Site, the Court analyzes the Village's claims concerning these wells under CERCLA § 107(a). Although IBM devotes much of its opening brief to arguing that the Village's claims are statutorily barred under CERCLA § 113(f), it also contends that such claims are likewise barred under § 107(a). (Def. Mem. at 17 n.16.) IBM expands on this argument in its reply. (ECF No. 26, "Def. Reply," at 7.) The Court nevertheless disagrees.

"For cost recovery actions under § 107, CERCLA distinguishes between two kinds of response: remedial actions—generally long-term or permanent containment or disposal programs—and removal efforts—typically short-term cleanup arrangements." *105 Mt. Kisco Assocs.*, 2017 WL 1194700, at *7 (S.D.N.Y. Mar. 30, 2017) (cleaned up). The statute of limitations for the recovery of costs incurred in relation to "'removal actions' is three years after the completion of the removal action . . . while the limitations period for the recovery of costs related

20

to 'remedial actions' is six years after the initiation of physical on-site construction of the remediation." *Id*. (citing *Schaefer v. Town of Victor*, 457 F.3d 188, 195 (2d Cir. 2006); 42 U.S.C. § 9613(g)(2)).

The FAC provides limited detail as to the specific actions the Village has undertaken with respect to Wells 5 and 28 beyond taking them offline in December 2020.  (FAC ¶ 10.)  Although the Village alleges ongoing sampling and planned remedial measures, it does not plead when any remedial action—particularly the initiation of physical on-site construction—commenced.  (*Id*. ¶¶ 129, 138.)  The Court further notes that, while the Village alleges that it plans to construct a new well, the FAC does not allege that construction has begun.  (*Id*. ¶ 20.)  The Court therefore cannot determine from the face of the pleadings when the statute of limitations began to run.  However, assuming that the limitations period began in December 2020, when the Village took Wells 5 and 28 offline, the Village's claims are timely because it commenced this action on December 3, 2024—well within six years of that date.  *See Next Millenium Realty*, 732 F.3d at 128 ("retiring contaminated wells and building an entirely new water supply system" is a remedial action).  At this stage, dismissal on statute-of-limitations grounds is not warranted.

### iii.    The Village's CERCLA § 107(a) Claims

The Court finally addresses whether the Village adequately pleads a claim under CERCLA § 107(a).  To state a claim under CERCLA § 107(a), a plaintiff must allege that: (1) the defendant is a covered person; (2) the site is a facility; (3) there has been a release or threatened release of a hazardous substance; and (4) the plaintiff incurred response costs consistent with the National Contingency Plan.  *See Niagara Mohawk*, 596 F.3d at 121; *R&G Enters., Inc. v. Choi*, 2022 WL 16731449, at *8 (S.D.N.Y. May 24, 2022), *report and recommendation adopted*, 2022 WL 5434986 (S.D.N.Y. Oct. 7, 2022).

Applying these principles, the Court concludes that the Village has plausibly alleged a claim under CERCLA § 107(a). The Village alleges that IBM is a covered person because it owned and operated the relevant facilities—namely, the Campus—and disposed of hazardous substances that are now being detected in Wells 5 and 28. (FAC ¶¶ 46, 143.) For instance, IBM allegedly released 4,100 gallons of TCA—a substance stabilized with 1,4-Dioxane—into the environment. (*Id.* ¶ 119.) The Village further alleges that IBM used PFAS in its chip-making processes at the Campus. (*Id.* ¶ 43.) These are the same hazardous substances that the Village alleges have been detected in Wells 5 and 28. (*Id.* ¶¶ 129, 138.) The Village also alleges that the Campus constitutes a "facility" within the meaning of CERCLA and that there have been releases of hazardous substances—including 1,4-Dioxane and PFAS—that migrated into the groundwater and contaminated the Village's wells. 42 U.S.C. § 9601(9). Finally, the Village alleges that it has incurred response costs and that such costs are consistent with the National Contingency Plan, 40 C.F.R. Part 300. (FAC ¶ 150.)

At this stage, these allegations are sufficient to state a claim for cost recovery under § 107(a), and IBM's arguments to the contrary are unpersuasive.

## II.    The Village's State Law Claims

The Court next addresses the Village's state law claims, including failure to warn, negligence, public nuisance, and trespass.

### A.  Preemption of Well 32 Claims

IBM first contends that the Village's state law claims are preempted because the Village is undertaking unauthorized remediation at the Superfund Site. (Def. Mem. at 13.) As discussed above, the Court has concluded that the Village's claims concerning Well 32 are procedurally barred under CERCLA § 122(e)(6) because Well 32 is part of the Superfund Site. Once the EPA

has initiated a remedial investigation and feasibility study at a facility, "no potentially responsible party may undertake any remedial action at the facility unless such remedial action has been authorized" by the EPA.  42 U.S.C. § 9622(e)(6); Exec. Order No. 12,580.

Under these circumstances, state law claims are precluded to the extent they would impose liability for actions that conflict with or circumvent EPA-directed remediation efforts at a Superfund Site.  *See Bartlett v. Honeywell Int'l Inc.*, 737 F. App'x 543, 551 (2d Cir. 2018) ("CERCLA preempts the [Village's] attempts to impose state tort law liability on [IBM] for not going above and beyond a testing regime which the EPA itself described as 'extensive.'").  This principle is particularly applicable here, where the Village, IBM, and the EPA have engaged in "decades of legal and technical efforts" to remediate the Superfund Site.  (FAC ¶¶ 113–134.) Because Well 32 is part of the Superfund Site and subject to EPA-directed remediation, the Village's state law claims concerning Well 32 are preempted and dismissed.  *See Salerno v. City of Niagara Falls*, 2020 WL 5814406, at *5 (W.D.N.Y. Sept. 30, 2020) ) ("[A]ny state law claims related to either the process of disposal and/or remediation at [a Superfund Site] were settled by means of a consent order, approved by the federal government, and are preempted."), *aff'd*, 2021 WL 4592138 (2d Cir. Oct. 6, 2021).

### B.  Wells 5 and 28 State Law Claims

#### i.    Failure-to-Warn

As a preliminary matter, the Village pursues a failure-to-warn claim, contending that IBM "breached its duty [ ] as a landowner" by failing "to warn Plaintiff of the likelihood of release of hazardous substances, including but not limited to 1,4-Dioxane, PFAS and other toxic chemicals." (FAC ¶ 183.)  The Village clarifies in its opposition that it is not pursuing a product liability failure-to-warn claim, and "agree[s] that such a claim would not be viable because, of course, IBM did

not manufacture the toxic chemicals at issue." (Pl. Opp. at 14.) Instead, the Village appears to premise its failure-to-warn theory on IBM's status as a landowner that allegedly created or contributed to a dangerous condition affecting neighboring property. (*Id.*) However, the Village's clarification of its failure-to-warn claims makes is nearly identical to its negligence claim, which likewise alleges that IBM breached its duty by releasing hazardous substances from its property that migrated into the Village's groundwater, contaminated its wells, and caused the Village to incur significant costs. (*See* FAC ¶¶ 168–181.)

Framed in that manner, the failure-to-warn claim substantially overlaps with the negligence claim, rendering it duplicative and subject to dismissal. *See Lucey v. Saint-Gobain Performance Plastics Corp.*, 2018 WL 2926289, at *9 (N.D.N.Y. June 11, 2018) ("New York courts generally consider strict products liability and negligence claims to be 'functionally synonymous.'"); *Pinello v. Andreas Stihl Ag & Co. KG*, 2011 WL 1302223, at *16 (N.D.N.Y. Mar. 31, 2011) (same); *Hogan v. Rose*, 2022 WL 675703, at *6 (N.D.N.Y. Mar. 7, 2022) ("[A] claim premised on premises liability is a species of negligence claim."); *PB-36 Doe v. Niagara Falls City Sch. Dist.*, 152 N.Y.S.3d 243, 246 (Sup. Ct. Niagara Cty. 2021) (concluding that a "premises liability cause of action" was "duplicative of the negligence causes of action"); *R&G Enters*, 2022 WL 16731449, at *8 (dismissing duplicative state law claims in connection with CERCLA claims).

### ii. Negligence

Turning to the Village's negligence claim, under New York law, "a plaintiff must establish three elements to prevail on a negligence claim: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *SUEZ Water New York Inc. v. E.I. du Pont de Nemours & Co.*, 578 F. Supp. 3d 511, 551 (S.D.N.Y. 2022) (quoting *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 177 (2d Cir. 2013)). In

the context of "pollution of underground waters, liability may be found only upon a demonstration that the defendant 'failed to exercise due care in conducting the allegedly polluting activity or in installing the allegedly polluting device, and that he or she knew or should have known that such conduct could result in . . . contamination.'"  *Id*. (quoting *Strand v. Neglia*, 232 A.D.2d 907, 907 (3d Dep't 1996)).

A district court in this Circuit recently explained that the rationale behind the "duty not to pollute a plaintiff's drinking water" is that "[s]ociety has a reasonable expectation that manufacturers avoid contaminating the surrounding environment, an expectation that extends to the pollution of an area's water supply." *Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp. 3d 233, 245 (N.D.N.Y. 2017), *aff'd in part, appeal dismissed in part*, 959 F.3d 70 (2d Cir. 2020); *see also  In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 80–83, 87, 117–19 (2d Cir. 2013) (noting a duty of care to avoid chemical leaks and water contamination under New York law); *Leone v. Leewood Serv. Station, Inc.*, 212 A.D.2d 669, 624 N.Y.S.2d 610, 612 (1995) (per curiam) (finding "a duty to use reasonable care to maintain . . . underground tanks in a reasonably safe condition").  It is sensible public policy to require that manufacturers avoid polluting the drinking water of the surrounding community. *Id*.

Applying these principles, the Court concludes that the Village has plausibly alleged a negligence claim with respect to Wells 5 and 28.  The Village alleges that IBM owned and operated the Campus and used and disposed of hazardous substances, including 1,4-Dioxane and PFAS, in a manner that resulted in contamination of the surrounding groundwater.  (FAC ¶¶ 5–6.)  For instance, the FAC specifically alleges an incident in which IBM released 4,100 gallons of TCA—a substance stabilized with 1,4-Dioxane—into the environment.  (*Id*. ¶ 119.)  The FAC further alleges that IBM employed PFAS and other toxic substances in its chip-making processes until

25

2010. (*Id.* ¶¶ 42–44.)  The FAC likewise alleges that IBM knew or should have known that such conduct could result in the migration of hazardous substances into nearby water sources, including the Village's wells. (*Id.* ¶¶ 6, 53.)  These allegations are not conclusory, notwithstanding IBM's contention to the contrary, and are sufficient at this stage to plausibly establish the existence of a duty and a breach thereof.  This is especially so given the well-recognized duty to avoid contaminating drinking water supplies.  *See, e.g.*, *White Plains Hous. Auth. v. BP Prods. N. Am. Inc.*, 482 F. Supp. 3d 95, 121 (S.D.N.Y. 2020) (finding defendant negligent where "investigations . . . revealed that the groundwater and soil contamination on the portions of Plaintiff's property adjacent to the [defendant's property] contained various chemicals"); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liability Litig.*, 725 F.3d at 117 (concluding that the evidence supported a negligence verdict where the record contained evidence of "gasoline spills and leaks at [defendant]-controlled stations" that traveled into the surrounding environment and defendant "could have taken [steps] to prevent, or at least mitigate the damage from, the[ ] contamination incidents"); *White Plains Hous. Auth. v. Getty Props. Corp.*, 2014 WL 7183991, at *16 (S.D.N.Y. Dec. 16, 2014) ("A landowner who engages in activities that may cause injury to persons on adjoining premises surely owes those persons a duty to take reasonable precautions to avoid injuring them.").  The Village has therefore adequately stated a claim for negligence.

### iii.     Public Nuisance and Trespass Claims

The Court next addresses the Village's public nuisance and trespass claims.  IBM's opening brief does not specifically address these claims, (Def. Mem. at 21–25), a point the Village highlights in its opposition.  (Pl. Opp at 14.)  In reply, IBM contends that its broader argument, that CERCLA preempts all of the Village's state law claims, encompasses the Village's public nuisance and trespass claims.  (Def. Reply at 3 n.2.)  The Court agrees with IBM to the extent that

26

this argument applies to state law claims concerning Well 32, as those claims are preempted by CERCLA § 122(e)(6).  At this juncture, however, the Court cannot reach the same conclusion with respect to the Village's state law claims concerning Wells 5 and 28.

To the extent IBM seeks dismissal of these claims on other grounds, the Court declines to consider such arguments, as IBM did not move to dismiss the Village's public nuisance and trespass claims in its opening brief.  *See, e.g.*, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 2016 WL 5719749, at *5 n.3 (S.D.N.Y. Sept. 29, 2016) ("the Court declines to address these arguments in light of Defendants' failure to move to dismiss the fraud claim."); *Seekamp v. Fuccillo Auto. Grp., Inc.*, 2010 WL 980581, at *7 (N.D.N.Y. Mar. 15, 2010) ("Defendants' failure to move to dismiss Plaintiff's individual claims, this Court need not address Plaintiff's individual causes of action at this time."); *Am. Infertility of New York, P.C. v. CNY Fertility, PLLC*, 2021 WL 4803539, at *1 (S.D.N.Y. Oct. 13, 2021) (declining to consider an issue not "adequately briefed" where the defendant failed to address it until its reply brief).

### III.    Double Recovery

Finally, IBM contends that the Village improperly seeks damages that were addressed in a prior settlement.  (Def. Mem. at 24.)  Specifically, IBM asserts that the Village was a class member in a $13 billion settlement resolving claims that a different defendant contaminated the Village's water supply with PFAS.  (*Id.*)  That action was *Vill. of Endicott v. 3M Co.*, No. 2:23-cv-02918-RMG.  (*Id.* at 7.)  IBM does not dispute that discovery is required to determine the amount of damages, if any, the Village received from the MDL settlement.  (Def. Mem. at 24.)  Nor does the Village dispute that IBM may seek an offset under state law and, potentially, under CERCLA.  (Pl. Opp. at 15.)  However, IBM's argument is limited to the assertion that, in the MDL action, the Village referenced only the "Ranney Well (#32)" and the "aquifer" from which the Village draws

water.  (Def. Mem. at 7.)  The Court has dismissed all claims relating to Well 32, and the surviving claims pertain only to Wells 5 and 28.  Discovery is required to determine if Wells 5 and 28 are connected to Well 32.  At this juncture, "[i]t is simply too soon to determine whether double recovery is a real possibility" because IBM's argument is "premature at best and not sufficiently developed." *New York v. W. Side Corp.*, 790 F. Supp. 2d 13, 28 (E.D.N.Y. 2011).  "Discovery holds the key in such situations." *Id*.  Consequently, at least at this time, IBM's motion to dismiss the Village's claims on grounds of double recovery is denied.[7]

## CONCLUSION

For the foregoing reasons, IBM's motion to dismiss is GRANTED in part and DENIED in part.  The Village's CERCLA and state law claims are dismissed to the extent they relate to Well 32.  The Village's failure-to-warn claim is dismissed as duplicative of its negligence claim.  IBM's motion is denied with respect to the Village's CERCLA § 107(a) claims concerning Wells 5 and 28, as well as its negligence, public nuisance, and trespass claims insofar as they relate to those wells.  IBM is therefore directed to answer or otherwise respond to the Village's FAC by June 5, 2026.  After Defendant files its answer, the parties are directed to meet and confer and file a joint proposed Case Management Plan for the Court's consideration no later than July 3, 2026.  The Clerk of Court is respectfully directed to lift the stay in this matter and to terminate the motion at ECF No. 24.

SO ORDERED,

Dated: May 6, 2026
         White Plains, NY

_____
Nelson S. Román, U.S.D.J.

---

[7] To the extent IBM seeks to limit the scope of discovery, it may raise that issue before the magistrate judge upon referral of this case.